**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE  DIVISION**

| | |
|---|---|
| CSX TRANSPORTATION, INC., | ) CASE NO. 2:06-CV-0112 RLY-WGH |
| Plaintiff, | ) Consolidated |
| v. | ) |
| | ) |
| JOHN J. VELA, JOHN J. VELA TRUCKING | ) |
| d/b/a JAY'S TRUCKING, et al., | ) |
| Defendants. | ) |
| —————————————————————— | ) |
| JOHN J. VELA and JOHN J. VELA | ) |
| TRUCKING d/b/a JAY'S TRUCKING, | ) |
| Counterclaimants, | ) |
| v. | ) |
| | ) |
| CSX TRANSPORTATION, INC., | ) |
| Counterclaim Defendant. | ) |
| —————————————————————— | ) |
| DONALD RAY HUFF, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| CSX TRANSPORTATION, INC., et al., | ) |
| Defendants. | ) |
| —————————————————————— | ) |

**DEFENDANTS/COUNTERCLAIMANTS JOHN J. VELA AND JOHN J. VELA**
**TRUCKING D/B/A/ JAY'S TRUCKING'S BRIEF IN OPPOSITION TO CSX**
**TRANSPORTATION INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.  INTRODUCTION**

On February 6, 2006, John J. Vela was driving his tractor pulling a Trail Boss Low Boy

trailer (hereinafter "Low Boy").  As Mr. Vela was crossing the Washington Street crossing in

Sullivan, Indiana, his trailer became stuck on the tracks.  A CSX train collided with Mr. Vela's

tractor-trailer.  The train derailed, Mr. Vela's tractor-trailer was destroyed, and a subsequent

clean-up was required.  CSX sued Vela, asserting a state law negligence claim, and Vela counter-

claimed.  Donald Huff, the train's engineer, also sued Vela asserting a state law negligence claim.  It is Vela's position that the negligence of CSX caused his tractor-trailer to become lodged on the tracks, which in turn caused the subsequent train derailment and damages.

Federal preemption does not apply under the circumstances of this case.  CSX, as a plaintiff asserting state law negligence claims, cannot use preemption offensively to deprive Vela of comparative fault defenses to CSX's state law claims.  Further, the claims advanced by Vela are not preempted, because they do not conflict with or frustrate the purpose of CSX's statutory obligations under the Federal Railroad Safety Act.  Finally, CSX is not entitled to summary judgment on Vela's claim relating to crossing slope and signage.

## II. <u>STATEMENT OF MATERIAL FACTS IN DISPUTE</u>

1.    On January 30, 2006, CSX altered the profile of the grade crossing when it performed work on the grade crossing and/or tracks (hereinafter "January reconditioning"). (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

2.    During the January reconditioning, cold patch asphalt was placed in the potholes. (**Exhibit B**, Foster Dep. at 8:6-24; 9:7-25.)

3.    One of the CSX workers who performed the January reconditioning only remembers being there to fill potholes and not to do any work on the on the rails of the tracks at the crossing.  (**Exhibit B**, Foster Dep. at 8:6-25; 9:6-25; 24:13-16.)

4.    CSX does not keep specific records when it reconditions or renews crossings, or of the nature of the repairs performed.  (**Exhibit D**, CSX Transportation's Second Supplemental Answers to Vela Defendants' Interrogatories at 18.)

5.    The January reconditioning performed by CSX at the Washington street grade crossing did not hold up to the weight of traffic. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

6.    The January reconditioning and placement of cold patch performed by CSX contractors created extrusions and wave-like patterns in the grade crossing. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

7.    The January reconditioning and placement of cold patch was not stable enough for deep layer application as it was used. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 6.)

8.    Whenever CSX performed "patch work" and "pothole repair," it would not last more than a day or two.  (**Exhibit E**, Farmer Dep. at 28:5-9.)

9.    Several days prior to the collision, Mr. Vela asked the Chief of the Sullivan City Police Department what route he should take in his Low Boy trailer. (**Exhibit F**, Vela Dep. at 62:4-16.)

10.    Officer Cooper stated that the Washington Street crossing was usable. (**Exhibit F**, Vela Dep. at 63:1:5.)

11.    Prior to the incident, Mr. Vela had crossed the tracks, without incident, pulling the exact same trailer and load combination.  (**Exhibit F**, Vela Dep. at 65:1-25; 66:1-15.)

12.    Mr. Vela's Low Boy trailer had a clearance well exceeding nine (9) inches. (**Exhibit F**, Vela Dep. at 104:25-26; 105:1-4, 22-26; 106:1-2; **Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

13.    Mr. Vela had measured the Low Boy trailer, unloaded, in the past, and the clearance exceeded a foot. (**Exhibit F**, Vela Dep. at 105:9-25; 106:1-2.)

14.     Upon approaching the crossing, Mr. Vela slowed down because the tracks were rough. (**Exhibit F**, Vela Dep. at 75:17-19.)

15.     Mr. Vela did not call the "800 number" because it was side by side (adjacent to) with his cab, and he did not see it.  (**Exhibit F**, Vela Dep. at 92; 93:1-15.)

16.     Even though Mr. Vela's clearance was between 12.62 to 13.36 inches, his Low Boy trailer could not pass over the tracks. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

17.     In 2005, a car got stuck on the tracks due to the condition of the tracks. (**Exhibit E**, Farmer Dep. at 37:17-25; 38:1-13.)

18.     During the 2005 incident, the potholes adjacent to the tracks caused the tire on the car to go flat, which in turn caused the car to become stuck on the tracks.  (**Exhibit E**, Farmer Dep. at 37:17-25; 38:1-8. )

19.     CSX had received numerous calls regarding the condition of the tracks and grade crossing at Washington Street prior to the derailment February 6, 2006, which the City of Sullivan relayed to CSX.  (**Exhibit E**, Farmer Dep. at 9:22-25; 10:1-25.)

20.     Detailed messages regarding the problems at the crossing were left for CSX and calls were returned by employees of CSX. (**Exhibit E**, Farmer Dep. at 10:23-25; 11:10-15; 12:14-25; 13:1-6; 26:1-10; 41:8-11.)

21.     Prior to the derailment, CSX only did "patch work" to repair the potholes. (**Exhibit E**, Farmer Dep. at 29:10-23.)

22.     The potholes at the grade crossing had been repaired by CSX several times. (**Exhibit G**, Dean Dep. at 35:18-23.)

23.     CSX was aware of the problems at the Washington Street grade crossing due to inspector reports, complaints from the City of Sullivan, or both.  (**Exhibit G**, Dean Dep. at 36:1-5.)

24.     The condition at the Washington Street grade crossing was so bad that it was newsworthy.  (**Exhibit H**, Boles Dep. at 13:21-25.)

25.     The *Sullivan Daily Times* published an article with photographs on December 16, 2005.  (**Exhibit A3**, Stansifer Additional Document: Sullivan Daily Times Article of December 16, 2005.)

26.     A newspaper reporter covered the story about the Washington Street grade crossing because it was in such bad condition.  (**Exhibit H**, Boles Dep. at 13:20-25.)

27.     At one point while covering the story about the grade crossing, the reporter put a basketball inside a hole to illustrate the depth of some of the holes.  (**Exhibit H**, Boles Dep. at 14:1-3.)

28.     Prior to, but close to the time of the derailment in the case at bar, CSX was scheduled to meet with the Mayor of the City of Sullivan regarding repairing the East Washington Street grade crossing. (**Exhibit E**, Farmer Dep. at 26:11-25.)

29.     The meeting was cancelled due to a train derailment elsewhere. (**Exhibit E**, Farmer Dep. at 26:14-25.)

30.     Although employees of CSX had communicated with the person in charge of health and safety for the City of Sullivan, it was the City of Sullivan's understanding that it was CSX's responsibility to undertake repairs at the Washington street grade crossing. (**Exhibit E**, Farmer Dep. at 10:23-25; 11:1-9; 41:7-10.)

31.     The altered profile, wave-like conditions and extrusions caused an extremely hazardous condition at the Washington Street grade crossing. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

32.     CSX failed to notify the general public of this extremely hazardous condition which caused Mr. Vela's Low Boy trailer to get stuck on the tracks. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

33.     CSX never informed the City of Sullivan that it had any responsibility with regard to repairs at the Washington Street grade crossing.  (**Exhibit E**, Farmer Dep. at 41:14-16.)

34.     There is no federal law, rule, or industry standard pertaining to a railroad's authority to replace pavement on either side of the tracks at an existing grade crossing.  (**Exhibit G**, Dean Dep. at 22:1-25; 23:1-2; 31:7-16; 33:11-25; 34:1-25; 35:1-25.)

35.     Railroad track inspectors routinely inspect up to thirty (30) feet on either side of the rails.  (**Exhibit C**, Jones Dep. at 22:6-14.)

36.     CSX recognized that the potholes caused a hazard to vehicles trying to cross the tracks and repaired them on several occasions.  (**Exhibit G**, Dean Dep. at 35:14-22.)

37.     CSX has the "ability" to make repairs 30 feet from either side of the rails. (**Exhibit C**, Jones Dep. at 22:11-14.)

38.     CSX internal standards require a three (3) inch drop for every thirty (30) feet, or a one (1) inch drop for every ten (10) feet.  The purpose of the slope guidelines is so that trucks will not get caught (on the tracks).  (**Exhibit I**, Lytle Dep. at 28:8-14.)

39.     On or about June 21, 2006, CSX renewed the crossing and replaced pavement on at least 30 feet of either side of the rails.  (**Exhibit G**, Dean Dep. at 68:3-25; 69:1-20.)

40.     Although CSX denies that it had the right to control 30 feet on either side, it admitted that contractors for CSX did repave (lay asphalt) at least that much of the grade crossing on or about June 21, 2006.  (**Exhibit G**, Dean Dep. at 68:3-25; 69:1-20.)

41.     The distance from the tracks, regarding how much pavement is repaired by a railroad when it does work on the tracks, "varies from location to location."  (**Exhibit G**, Dean Dep. at 22:1-23:2-4.)

42.     The FRA does not cover the condition of existing grade crossing or existing potholes.  (**Exhibit G**, Dean Dep. at 34:5-8.)

43.     FRA inspectors usually request that the inspectors put only FRA defects in their daily FRA reports.  Holes the size of basketballs are not one of the FRA defects that would be reported.  (**Exhibit G**, Dean Dep. at 34:5-22.)

44.     CSX was aware that the potholes and extrusions posed a hazard to the motoring public and to vehicles trying to cross the Washington Street tracks because it repaired them.  (**Exhibit G**, Dean Dep. at 35:14-22).

45.     After the derailment, CSX became more responsive to the Washington Street crossing and fixed the holes.  (**Exhibit E**, Farmer Dep. at 41:14-16.)

46.     There are no FRSA standards that deal with slope of existing crossings.  (**Exhibit G**, Dean Dep. at 80:14-16.)

47.     There are no FRSA standards or procedures for roadway resurfacing on the existing crossings. (**Exhibit G**, Dean Dep. at 80:17-21.)

48.     There are no federal standards for railroads regarding repairs that regulate the clearance of the crossing and low vehicles.  (**Exhibit G**, Dean Dep. at 80:17-25.)

49.     The January reconditioning made the tracks un-passable for Mr. Vela's Low Boy trailer. (**Exhibit A1**, Stansifer Accident Reconstruction Report at 1.)

### III.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper when all of the evidence shows that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In determining whether or not a material issue of fact exists, the court shall view the evidence and draw all reasonable inferences and ambiguities in favor of the non-moving party.  *Turfariello v. Long Island Railroad Company*, 458 F.3d 80, 83 (2nd Cir. 2006); *Haelfling v. United Parcel Service, Inc.*, 169 F.3d 494, 497 (7th Cir. 1999); *Fisher v. Transco Services-Milwaukee, Inc.*, 979 F.2d 1239, 1242 (7th Cir. 1992).   What makes an issue "material" and "genuine" is driven by substantive law applicable to the case.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists in a case when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*.  Only if the moving party has met its burden must the non-moving party go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial.  *Id*.

## IV. <u>ARGUMENT</u>

A.    <u>CSX Cannot Pursue a State Law Negligence Claim and Assert the Doctrine of Federal Preemption to Bar Vela's Comparative Fault Defenses.</u>

    1.    <u>Conflict Preemption Preempts State Law *Claims* That Are Contrary to Federal Law.</u>

The preemption doctrine is found in the United State Constitution's Supremacy Clause. U.S. CONST. ART. VI, cl. 2; *Gibbons v. Ogden*, 22 U.S. 1, 210-213 (1824).  Conflict preemption "invalidates state laws that interfere with, or are contrary to federal law." *Sprint Spectrum L.P. v Mills*, 283 F.3d. 404, 414-415. (2nd. Cir. 2002), (*citing Hillsborough v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712 (1985); *see also*, *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) ("implied preemption occurs 'either when the scope of a statute indicates Congress intended federal law to occupy a field exclusively, . . . or when a state law is in actual conflict with a federal law'").  The intention of Congress "is the ultimate touchstone in every preemption case." *Meditronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996).  Preemption only applies to claims, not state law defenses. *O'Melveny v. FDIC*, 512 U.S. 79, 83-89 (1994) (California state law defenses held applicable to defense of FDIC claims).  A person sued under a state's law has the right to use state law defenses "with whatever arsenal the law of the [S]tate . . provides." *FDIC v. Haddad*, 826 F.Supp. 1419, 1424 (S.D. Fla. 1993), *quoting FDIC v. McSweeny,* 976 F.2d 532, 538 (9th Cir. 1992).

The FRSA expressly preempts *claims* under limited circumstances, and courts must "interpret relevant federal regulations narrowly to ensure a careful balance. . .between state and federal regulatory authority." *Williams v. Amtrac*, 392 F.Supp.2d 790, 792 (E.D. Tex. 2005). CSX has cited no authority in support of its apparent position that a state law defense to a state

law claim can be preempted.  Conflict preemption, by definition, applies only to state law claims that conflict with or frustrate the purpose of a federal law.

**2.      Under the Indiana Comparative Fault Act, Vela is Entitled to Raise the Negligence of CSX as a Defense to CSX's State Law Negligence Claims.**

The Indiana Comparative Fault Act allows Vela to apportion fault among persons -- including CSX -- whose fault caused or contributed to the loss.  Ind. Code Ann. § 34-51-2 *et seq.* The loss is calculated as a percentage of fault as determined by the trier of fact.  *City of Crawfordsville v. Price*, 778 N.E.2d 459, 463 (Ind. Ct. App. 2002). "Fault apportionment is. . . uniquely a question of fact to be decided by a jury."  *McKinney v. Public Services Co. of Indiana*, 597 N.E.2d 1001, 1008 (Ind. Ct. App. 1992).

Vela asserts that CSX negligently maintained and repaired the Washington Street crossing, created a hazard that was not apparent to the motoring public, and failed to warn both the City of Sullivan and the public about the danger.  As indicated in Section II of this brief, this case is replete with disputed material facts that implicate CSX's comparative fault.

**B.      Vela's Counterclaims are Not Preempted.**

CSX raised the rails at the Washington Street crossing to correct what it believed was a "profile defect" under the FRSA.  In doing so, CSX altered the profile of the crossing and compounded its error by using cold patch, which created a hazard for low-clearance vehicles such as Vela's Low Boy trailer.  Vela alleges that CSX was negligent in the way that it maintained and repaired the crossing, and that CSX negligently failed to warn the local municipality or the motoring public about the hazards that it created at the crossing.

As CSX correctly states in its brief, a federal regulation does not preempt a state law claim unless the federal regulation attempts to regulate the same subject matter that is the subject of the state claim.  A federal safety regulation that merely "touches upon" or "relates to" the subject of the state claim has no preemptive effect.  *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); CSX's Brief in Support of Motion for Partial Summary Judgment, p. 13 (hereinafter *CSX Brief*).  Vela does not contend that CSX was negligent in attempting to raise the rails to correct a profile deviation as required by the FRSA; rather, Vela contends that CSX negligently performed the work, thereby creating an insidious safety hazard without warning the general public.  These state law claims do not conflict with any federal safety regulations; at best, they merely "touch upon" or "relate to" the same subject matter.  *Easterwood*, *Id*.  There is a plethora of disputed material facts in support of Vela's claims, as outlined in Section II of this brief.  Vela's counterclaims, therefore, are not preempted by federal law.

C.     **CSX is not Entitled to Summary Judgment on Vela's Slope-Related Claims Because CSX Assumed a Duty to Either Modify the Slope of the Crossing or to Warn the Public About the Severity of the Slope.**

CSX argues that under Indiana law, it had no duty to modify the slope of the crossing, or to warn the general public about slope deficiencies, because the railroad is only responsible for the space between the rails and to the edges of the ties outside of the rails.  CSX concedes, however, that railroads must maintain that portion of the crossing "that is disturbed during track maintenance activities."  (*CSX Brief* at p. 15.)  There are a wealth of disputed material facts in this case that, if proven, will establish that CSX exercised control over the slope on either side of the crossing.  CSX admitted that its track inspectors routinely inspected up to 30 feet on either side of the rails.  (**Exhibit C**, Jones Dep. at 22:16-14.)  A CSX employee has admitted that CSX has the "ability" to make repairs 30 feet from either side of the rails.  (**Exhibit C**, Jones Dep. at

22:11-14.)  CSX internal standards require a three-inch drop for every 30 feet, or a one-inch drop for every 10 feet.  The purpose of these slope guidelines is to prevent trucks (like Vela's) from becoming stuck on the tracks.  (**Exhibit I**, Lytle Dep. at 28:8-14.)  Nevertheless, in June of 2006 -- a little more than four months after this incident -- CSX completely renewed the Washington Street crossing and replaced the pavement on either side of the rails, extending out at least 30 feet, but did not correct the slope deficiencies that existed.  (**Exhibit G**, Dean Dep. at 68:3-25; 69:1-20.)  These repairs had been requested by the City of Sullivan prior to Vela's incident in February, 2006.  (**Exhibit E**, Farmer Dep. at 9:22-25; 10:1-25.)  Thus, CSX exercised control over the crossing after the accident, and could have done so before the accident.

Simply put, CSX knew that the Washington Street crossing did not comply with slope standards for new crossings, but failed to warn the public or the City of Sullivan of the hazards presented by the slope of the crossing.  CSX exerted control over the crossing by completely reconditioning it months after the incident at issue.  Issues of fact remain for the jury as to whether CSX should have corrected the slope issue and/or warned the public of the dangerous slope prior to Vela's incident.

**D.**   **CSX is not Entitled to Summary Judgment on Vela's Low-Clearance Warning Claim Because CSX Had a Duty to Warn of the Low-Clearance Condition at the Crossing.**

CXS argues that it had no duty under Indiana law to post a low-clearance sign at the crossing.  This argument misses the point; regardless of whether CSX could have erected a sign -- which is a disputed issue -- CSX's negligence was in failing to warn the City of Sullivan of the low-clearance condition and thus the need for signage.  CSX had a duty under Indiana law to assess the dangers presented at the crossing and to determine whether additional warnings were necessary.  *Smith v. Chesapeake & Ohio Railway Co.*, 778 F.2d 384, 388 (7th Cir. 1985).

Indiana law would not have prevented CSX from warning the City of Sullivan that additional signage was necessary, or, alternatively, from receiving Sullivan's express authorization to erect such signage.  Therefore, disputed issues of fact exist as to whether CSX was negligent in failing to warn of the low-clearance condition at the Washington Street Crossing -- a condition created by CSX's negligent repair work.

## V.  **CONCLUSION**

CSX sued Vela for negligence under state law.  Vela is entitled to raise all available state law comparative fault defenses.  The doctrine of conflict preemption simply does not bar state law defenses.

Vela's counterclaims are not preempted.  These counterclaims do not conflict with federal law because there is no federal safety regulation that governs the same subject matter.

Finally, the jury should determine whether CSX's exercise of control over the crossing gave rise to a duty to remediate the slope of the crossing or warn the general public of the dangerous slope.  Similarly, facts exist by which a jury could find that CSX negligently failed to gain approval for and/or warn the City of Sullivan of the necessity for a low-clearance sign.

WHEREFORE, these defendants pray that CSX's Motion for Partial Summary Judgment be denied.

LOCKE REYNOLDS LLP


By:  */s/Eric A. Riegner*
     Eric A. Riegner, #14057-49
     Matthew R. King, #24262-53
     Edward L. Holloran, III, #27452-49
     Attorneys for Defendants John J. Vela and
     John J. Vela Trucking d/b/a Jay's Trucking

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of October, 2008, a copy of the foregoing was filed electronically.   Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.   Parties may access this filing through the Court's system.

David A. Locke                                      Monica C. Carpenter
Stuart & Branigin LLP                          The Law Offices of Matt Parmenter
300 Main Street, Suite 900                   312 Main Street
P. O. Box 1010                                      P.O. Box 393
Lafayette, IN  47902                            Vincennes, IN  47591

dal@stuartlaw.com                              mcarpenter@mplawoffices.com

David Robert Jones
PRATT & TOBIN, P.C.
Route 111 at Airline Drive
P.O. Box 179
East Alton, IL  62024

ptpc2@sbcglobal.net

                                                        /s/Eric A. Riegner
                                                        _____

LOCKE REYNOLDS LLP
201 North Illinois Street, Suite 1000
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
*eriegner@locke.com*
*mking@locke.com*
*eholloran@locke.com*

813709_1

14